**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| A&Y NUTRITION, LLC,<br>Plaintiff,<br>v.<br>BIOVATION LABS, LLC,<br>Defendant. | No. 23cv1528 (EP) (AME)<br>**MEMORANDUM ORDER** |

**PADIN, District Judge.**

This case arises from supply chain issues during the COVID-19 pandemic when Defendant, Biovation Labs, LLC ("Biovation"), purchased raw materials from Plaintiff, A&Y Nutrition ("A&Y"), to be used in the manufacture of health supplements. *See* D.E. 1 ("Complaint" or "Compl."). After a few initial spot orders, Biovation agreed to purchase five different ingredients through the execution of four blanket purchase orders ("BPOs") for: (1) Turmeric; (2) Echinacea and Elderberry; (3) Quercetin; and (4) Ascorbic Acid. *See* Compl.

After disputes arose concerning Biovation's obligations under the BPOs, A&Y brought this action alleging that Biovation breached the terms of the purchase orders by failing to purchase the quantities stated in each order. As a result, A&Y brings the following counts as to all four purchase orders: (1) breach of contract (Count I); (2) violation of the Uniform Commercial Code ("UCC") (Count II); (3) breach of the implied covenant of good faith and fair dealing (Count III); and (4) promissory estoppel/detrimental reliance (Count IV). *See* Compl. Biovation now moves for partial summary judgment as it relates to three of the four purchase orders—for Turmeric, Quercetin, and Ascorbic Acid—and as to A&Y's lost profits damages theory, D.E. 59-1 ("Motion

for Partial Summary Judgment," the "Motion", or "Mot.").[1] A&Y opposes the Motion, D.E. 60 ("Opposition" or "Opp'n"), and Biovation replies, D.E. 63 ("Reply").

The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **DENY** Biovation's Motion for Partial Summary Judgment.

## I. BACKGROUND[2]

### A. The Parties' Business Relationship

A&Y is a distributor of raw ingredients used in dietary supplements, and Biovation is a company that manufactures nutritional supplements, specializing in the formulation, blending, encapsulation, and other packaging of nutritional supplements. SUMF ¶¶ 2–3. In September 2020, Biovation was looking for a new company to source raw materials for use in its products and began communicating with A&Y for the first time. *Id.* ¶¶ 5–7. In September 2020 and January 2021, the parties completed "spot" orders for defined quantities, delivery dates, and price.[3] *Id.* ¶ 8.

After these initial orders, the parties agreed that Biovation would purchase five raw materials from A&Y, and executed four BPOs for: (1) Turmeric (PO No. P185532) ("Turmeric

---

[1] Biovation filed its Notice of Motion at D.E. 59.

[2] The facts in this section are drawn from: (1) Defendant's Statement of Undisputed Material Facts, D.E. 59-2 ("SUMF"), (2) Plaintiff's response to Defendant's SUMF, D.E. 60-3 ("Resp. SUMF"), and such documents' accompanying declarations and exhibits. The facts in this Section, and throughout this Memorandum Order, are undisputed unless otherwise indicated. As the parties disagree as to many of the relevant facts, and the Court is denying Biovation's Motion because those disagreements exits, the Court limits the facts only to those relevant to the pending Motion.

[3] Though immaterial, the parties dispute whether Defendant paid these "spot order" invoices immediately upon delivery. SUMF ¶ 8; Resp. SUMF ¶ 8.

BPO”);[4] (2) Echinacea and Elderberry (PO No. P185533) (“Echinacea and Elderberry BPO”);[5] (3) Quercetin (PO No. P185849) (“Quercetin BPO”);[6] and (4) Ascorbic Acid (PO No. P187156) (“Ascorbic Acid BPO”).[7] The parties dispute the duration of each purchase order.

- **Turmeric**: Biovation argues that the operative Turmeric BPO was issued on May 24, 2021 and had a two-year term, and therefore expired on May 24, 2023. SUMF ¶ 9. A&Y disputes this and argues that the May 24, 2021 BPO was a revision to a BPO originally issued on March 8, 2021, so it therefore expired on March 8, 2023. A&Y asserts that the original Turmeric BPO was first amended on March 17, 2021 to reflect that some product would be delivered by air, and again on May 24, 2021 to correct a mistake over how one of the drums would be delivered. Resp. SUMF ¶ 9.
- **Quercetin**: The parties do not dispute that Biovation issued the Quercetin BPO on May 6, 2021 and that the document does not state an expiration date. SUMF ¶ 9. A&Y nevertheless argues that the Quercetin BPO had a finite term based on three

---

[4] Plaintiff argues that the operative Turmeric purchase order is dated March 8, 2021, *see* D.E. 60-1, Declaration of Mark Oberstaedt (“Oberstaedt Decl.”), Ex. 14. Defendant argues that the operative purchase order for Turmeric is the one dated May 24, 2021, Compl. Ex. 1. Both Turmeric purchase orders have the same order number.

[5] Plaintiff argues that the operative Echinacea and Elderberry purchase order is dated March 8, 2021, Oberstaedt Decl., Ex. 11. Defendant argues that the operative Purchase Order for Echinacea and Elderberry is the one dated March 17, 2021, Compl. Ex. 2. Both Echinacea and Elderberry purchase orders have the same order number.

[6] The parties do not dispute that the Quercetin purchase order was issued on May 6, 2021, though the parties dispute when it expired, as there is no express expiration date on the purchase order. *Compare* Oberstaedt Decl., Ex. 18; *with* Compl. Ex. 3.

[7] The parties do not dispute that the Ascorbic Acid purchase order was issued on February 23, 2022, though the parties dispute when it expired, as there is no express expiration date on the purchase order. *Compare* Oberstaedt Decl., Ex. 19, *with* Compl. Ex. 4.

pieces of evidence: (1) an internal Biovation memorandum describing a blanket order for "2,000 kilograms over the next six quarters"; (2) A&Y's managing member, Dominique Lock's testimony that he and Biovation's procurement specialist, Scott Cogswell agreed to a one-year term; and (3) testimony from Cogswell and A&Y's expert that one year was the industry standard when a BPO did not state a duration. A&Y therefore contends that the performance period expired either May 6, 2022 or November 6, 2022. Resp. SUMF ¶ 9.

- **Ascorbic Acid**: The parties do not dispute that the Ascorbic Acid BPO was issued on February 23, 2022, and that the document does not state an expiration date. A&Y argues that despite the BPO not stating an expiration date, under standard industry practice, the expiration date would have been one year and therefore expired on February 23, 2023. SUMF ¶ 37; Resp. SUMF ¶ 37.
- **Echinacea and Elderberry**: Biovation argues that the operative Echinacea and Elderberry BPO was issued on March 17, 2021, and had a one-year term, and therefore expired on March 17, 2022. SUMF ¶ 9. A&Y disputes this, arguing that the Echinacea and Elderberry BPO was originally issued on March 8, 2021, so it therefore expired on March 8, 2022. Plaintiff asserts that it was amended once on March 17, 2021 to reflect that some product would be delivered by air. Resp. SUMF ¶ 9.[8]

[8] As the Echinacea and Elderberry PO is not at issue in Defendant's Motion, the Court does not analyze the claims regarding the Echinacea and Elderberry PO, though as the four BPOs were intertwined, the Court explains the facts regarding the Echinacea and Elderberry PO to the extent it is relevant to the parties' factual disputes.

The parties refer to each of these purchase orders as blanket purchase orders, or "BPOs." SUMF ¶ 10. While the parties dispute the general definition of a BPO, a BPO generally refers to an agreement in which a buyer and supplier enter a long-term agreement over a set period of time to allow for multiple deliveries under one agreement to avoid creating a new purchase order each time. *See* SUMF ¶ 13; Resp. SUMF ¶ 13. Specifically, Biovation contends that the quantities specified in each BPO represented merely a forecasted amount of reserves from which it was given discretion to make later "callouts," or orders, while A&Y argues instead that each BPO was a commitment to purchase the entire stated quantity, in which callouts only allowed Defendant to control the timing of each delivery. SUMF ¶ 13; Resp. SUMF ¶ 13.[9] Throughout the parties' relationship, A&Y primarily communicated through Dominique Lock, its managing member, [10] and for Biovation through Scott Cogswell, a procurement specialist, [11] although other Biovation representatives including Cogswell's supervisor, Jason Ford, and Biovation's President, Justin Bath, also became involved in the parties' dispute.

To dispute Biovation's interpretation of its obligations under the BPOs, A&Y principally relies on the deposition testimony of Biovation's own representative Scott Cogswell, who prepared and issued several of the BPOs. Cogswell testified he understood a BPO to obligate Biovation to purchase the full quantity identified on the purchase order and to pay the stated amount. Cogswell Dep. at 16:9–17:17. He further testified that this understanding was shared by other Biovation

---

[9] More specifically, Biovation characterizes the quantities stated in the BPOs as forecasts of future need. A&Y disputes that characterization with testimony from Biovation's procurement specialist, Scott Cogswell, and its expert, Timothy McGee. Resp. SUMF ¶¶ 13–18 (citing Oberstaedt Decl., Ex. 28 ¶¶ 15–23; D.E. 59-4, Declaration of James Richter ("Richter Decl."), Ex. I, and Oberstaedt Decl., Ex. 4, Deposition of Scott Cogswell (collectively referred to as "Cogswell Dep.") at 16:9–17:17, 36:5–37:5, 45:20–46:7, 65:22–66:13, 78:13–79:15).

[10] *See* D.E. 60-2, Declaration of Dominique Lock ("Lock Decl.") ¶ 1.

[11] *See* SUMF ¶ 34; Opp'n at 4–5.

personnel involved in purchasing, including his supervisor, Jason Ford, and that he discussed with Ford A&Y's expectation that Biovation would purchase and pay for the quantities stated in the BPOs. *Id.* at 78:13–79:15. Cogswell gave similar testimony concerning the individual BPOs he issued, including the Turmeric and Quercetin BPOs. *See id.* at 36:5–37:5, 45:20–46:7, 65:22–66:13; Resp. SUMF ¶¶ 13, 15–18.

Cogswell also testified that Biovation may have executed BPOs to obtain lower pricing by committing to greater quantities, while assuming the risk that its demand needs might change later. Cogswell Dep. at 18:14–19:10, 27:25–28:11. Cogswell and Lock discussed that A&Y would import the materials into the United States so they would be available for Biovation's subsequent delivery requests, and Cogswell testified that Ford and others at Biovation knew A&Y was doing so. *Id.* at 29:20–31:2, 33:5–13. A&Y's expert, Timothy McGee, similarly opines that the BPOs obligated Biovation to purchase the full stated quantities and that subsequent callouts concerned the timing of deliveries rather than whether Biovation would purchase the product. Resp. SUMF ¶¶ 12–18; Oberstaedt Decl., Ex. 28 ¶¶ 15–23.

Biovation disputes each of A&Y's interpretations. Justin Bath, President of Biovation, instead testified that Biovation viewed BPOs as "fairly open" arrangements under which it "may or may not draw" from the stated quantities. Richter Decl. Ex. 4 and Oberstaedt Decl. Ex. 5, Deposition of Justin Bath (collectively referred to as "Bath Dep.") at 74:3–76:5. A&Y responds that Bath was not directly involved in raw material acquisition and that Biovation did not communicate this understanding to A&Y. Resp. SUMF ¶¶ 13–18; Opp'n at 35. Thus, the parties dispute whether the stated quantities constituted binding purchase commitments or forecasts from which Biovation retained discretion to make future callouts.

**B. The Parties' Disputes**

The parties' relationship deteriorated after Biovation's anticipated demand for several of the ingredients changed. For example, Biovation intended to use Turmeric in a product for one of its customers, Healthy Directions. Resp. SUMF ¶ 21. After the BPO was issued, however, Healthy Directions approved A&Y only as a secondary supplier and required Biovation to continue using another company as its primary supplier. Cogswell Dep. at 55:4–57:6, 61:9–63:21. Cogswell testified that he and Ford raised with Bath that Biovation had already made agreements with A&Y, and that Bath responded that Biovation "couldn't go forward with" those agreements. Cogswell Dep. at 56:16–57:6.

Similar issues arose with the Echinacea and Elderberry BPO, which is not itself the subject of this Motion but is still relevant to the parties' course of dealing, A&Y's implied covenant theory, and A&Y's damages theory. Biovation had obtained those ingredients in anticipation of demand from customers including GNC and Walgreens. Opp'n at 15. In 2021, those customers sought to reduce a significant portion of their own blanket orders with Biovation, and Biovation approved those reductions. *Id.* (quoting Bath Dep. at 52:16–53:2, 61:10–65:20). Cogswell testified that he and Ford discussed the resulting problem for the A&Y BPOs and that he later learned that Biovation was not going to honor some of its agreements with A&Y because Biovation and related companies had other supplier relationships that were being prioritized. Opp'n at 16–17 (quoting Cogswell Dep. at 74:8–77:8). He further testified that he told Ford that he understood Biovation would remain responsible for the material it had ordered from A&Y. Cogswell Dep. at 82:5–17.

The Quercetin BPO presented another supply issue. Quercetin, like Turmeric, was also to be used in a product for Healthy Directions, but Healthy Directions approved A&Y only as a secondary, rather than primary, Quercetin supplier. Opp'n at 19 (quoting Oberstaedt Decl., Ex.

17). Nevertheless, on May 6, 2021, Biovation issued the Quercetin BPO with A&Y for 2,000 kilograms. Opp'n at 19–20 (citing Oberstaedt Decl. Exs. 18, 19, & 24). An internal Biovation memorandum dated May 17, 2021 described that order as a blanket order for "2000kg over the next 6 quarters." Oberstaedt Decl., Ex. 24. Cogswell testified that, despite A&Y's secondary supplier status, Biovation may have agreed to the stated quantity to obtain the desired pricing. Cogswell Dep. at 65:22–66:13. A&Y, in turn, entered into a blanket purchase order with its own supplier for the full amount of Quercetin. Opp'n at 21 (citing Richter Decl., Ex. 5, Deposition of Dominique Lock ("Lock Dep.") at 112:5–113:19). Biovation paid for and received 700 kilograms of Quercetin but did not take the remaining 1,300 kilograms. Opp'n at 21; *see* Lock Decl. ¶¶ 8–9.

The parties continued to discuss the outstanding BPOs during 2022. According to A&Y, Biovation repeatedly indicated that it would try to take additional Echinacea, Elderberry, and Quercetin, but took no further deliveries of those products after the initial releases. Resp. SUMF ¶ 53; Lock Decl. ¶¶ 7–8. Biovation did make additional Turmeric callouts, including in January and February 2023. SUMF ¶ 23; Resp. SUMF ¶ 23.

A payment dispute also developed concerning Turmeric, however. A&Y contends that Biovation sought to apply funds that it had prepaid for Quercetin as a credit against amounts owed on Turmeric deliveries, even though A&Y had not agreed to that arrangement. Resp. SUMF ¶ 53; Lock Decl. ¶ 8; Oberstaedt Decl., Ex. 21. A&Y claims that Biovation therefore failed to pay certain Turmeric invoices in full.

Meanwhile, on February 23, 2022, Biovation issued the Ascorbic Acid BPO for 1,025 kilograms. Biovation never took delivery of or paid for any product under that BPO at the time the Complaint was filed. *See generally* SUMF; Bath Dep. at 223:25–224:13, 226:12–227:1.

By September 2022, A&Y retained counsel concerning the outstanding purchase orders. Opp'n at 23; Lock Dep. at 149:24–150:17. On September 6, 2022, A&Y's counsel wrote to Ford and Bath seeking information concerning each BPO and demanding payment of the outstanding Turmeric invoice within seven days. Oberstaedt Decl., Ex. 22; Resp. SUMF ¶ 62. When Biovation did not respond, counsel sent a second letter on September 14, 2022 extending the deadline by one week. *See* Oberstaedt Decl., Ex. 22; Resp. SUMF ¶ 62. A&Y characterizes those communications as efforts to obtain assurances that Biovation would perform its remaining obligations. *See* Opp'n at 23–24.

On October 12, 2022, after counsel for the parties had communicated, Ford emailed Lock that "there has been no deal that has been agreed upon," directed A&Y not to release additional Turmeric "at this time," and stated that he would not communicate further until counsel had "settled the issues." Lock Decl., Ex. 6; Resp. SUMF ¶ 62. Biovation disputes A&Y's characterization of this email and maintains that it was sent in connection with settlement discussions. Reply at 5–6. Lock further declares that Biovation did not assure A&Y that it would take and pay for the remaining Quercetin, Echinacea, and Elderberry, and did not assure A&Y that it would pay in full for future Turmeric deliveries without applying the disputed Quercetin credit. Opp'n at 23–24; Lock Decl. ¶ 13.

A&Y filed this action on March 20, 2023. *See* Dkt. The Complaint asserts four counts as to each BPO: (1) breach of contract (Count I); (2) violation of the UCC (Count II), (3) breach of the implied covenant of good faith and fair dealing (Count III), and (4) promissory estoppel/detrimental reliance (Count IV). A&Y also alleges that, to the extent Biovation had not already breached the BPOs, it had anticipatorily breached them. Compl. ¶¶ 99, 104, 110.

### C. A&Y's Claimed Damages

A&Y seeks several categories of damages arising from the BPOs, including lost profits. The parties agree that A&Y claims lost profits relating to 5,600 kilograms of Turmeric, 1,300 kilograms of Quercetin, 1,025 kilograms of Ascorbic Acid, and portions of the Echinacea and Elderberry BPO. SUMF ¶¶ 69–70; Resp. SUMF ¶¶ 69–70.

A&Y's interrogatory responses calculate those lost profits principally by subtracting the costs A&Y contends it would have incurred to supply each product from the applicable contract price. For Turmeric, A&Y identifies a cost of $65 per kilogram for the remaining 5,600 kilograms. Oberstaedt Decl., Ex. 27 ("A&Y Integratory Responses") at 5. For Quercetin, it identifies a landed cost of $96.98 per kilogram, consisting of raw material and freight costs together with customs and transportation expenses. *Id.* Its Ascorbic Acid calculation similarly calculates lost profits damages as a landed cost of $4 per kilogram for the remaining 1,025 kilograms. *Id.* at 6.

A&Y also represents that it produced financial statements, payroll records, profit and loss statements, tax returns and schedules, vendor contracts and invoices, communications with vendors, and storage records supporting its damages. Opp'n at 37; Lock Decl. ¶ 14. Biovation disputes the sufficiency of A&Y's lost profit methodology, arguing that it fails to account for all expenses that would have been incurred in generating the sales. SUMF ¶ 71; Resp. SUMF ¶ 71. A&Y did not produce a damages expert report. SUMF ¶ 72; Resp. SUMF ¶ 72.

## II. LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d

Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the nonmoving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.[12]

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits

---

[12] The Court notes that Plaintiff's responsive 56.1 statement repeats lengthy excerpts of the same testimony and improperly includes arguments that belong in its opposition brief. The Court has disregarded the characterizations of the evidence presented and instead considered the underlying cited evidence.

are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Indeed, "[i]f the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1302 (3d Cir. 1993) (citation modified). "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222, 1226 (D.N.J. 1994) (quoting *Anderson*, 477 U.S. 248).

## III. ANALYSIS

A&Y brings claims for breach of contract (Count I), violation of the UCC (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and promissory estoppel/detrimental reliance (Count IV) as to all four BPOs.

Biovation asserts it is entitled to partial summary judgment on all counts insofar as those claims concern the Turmeric BPO, Quercetin BPO, and Ascorbic Acid BPO on the basis that these BPOs had not yet expired when the Complaint was filed. *See* Mot. at 12–17. Biovation also seeks summary judgment on A&Y's lost profits damages theory on the basis that A&Y's lost profits analysis is incomplete. *Id.* at 18–20.

Below, the Court first addresses Biovation's request to disregard Lock's declaration under the sham affidavit doctrine. The Court then analyzes Counts I and II as to the three BPOs at issue; A&Y's alternative anticipatory repudiation and adequate assurances theory; Count III, A&Y's

alternative promissory estoppel theory; and finally, Biovation's challenge to A&Y's lost profits damages.

Viewing the evidence in A&Y's favor, the record contains genuine disputes regarding whether: (1) the BPOs obligated Biovation to purchase the stated quantities; (2) the BPOs expired before this action was commenced; (3) A&Y had reasonable grounds for insecurity and received adequate assurances; (4) Biovation exercised any call out discretion in bad faith; and (5) A&Y can establish lost profits with reasonable certainty. Those disputes cannot be resolved without weighing competing testimony and drawing factual inferences. Therefore, the Court will **DENY** Biovation's Motion for Partial Summary Judgment.

### A. The Court Will Not Disregard Lock's Declaration Under the Sham Affidavit Doctrine

Before analyzing the merits of Biovation's Motion, the Court addresses a threshold argument raised in Biovation's Reply: that the Court should disregard the declaration of A&Y's managing member, Dominique Lock, under the sham affidavit doctrine because it contradicts his deposition testimony and relies on statements made during settlement discussions. *See* Reply at 3–6.

The sham affidavit doctrine applies narrowly when a party submits a later affidavit that contradicts clear deposition testimony without a satisfactory explanation and is offered "solely for the purpose of defeating summary judgment." *Jiminez ex rel. Estate of Serrano v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Hang Hing Loong Trading Co. Ltd. v. INCO Ltd. Liab. Co.*, No. 15-3614, 2017 WL 4697069, at *11 n.16 (D.N.J. Oct. 18, 2017) (finding that differences between deposition testimony and affidavit were not enough to warrant application

of the sham affidavit doctrine). But "not all contradictory affidavits are necessarily shams," particularly when independent evidence corroborates the later affidavit. *Jiminez*, 503 F.3d at 254.

There is no contradiction warranting application of the doctrine here. Lock's deposition testimony that Biovation never expressly told him it would not fulfill the remaining Quercetin order does not contradict his later assertion that Biovation failed to provide adequate assurances of performance. *Compare* Lock Dep. 119:9–17, *with* Lock Decl. ¶ 13. Likewise, Lock's testimony regarding Turmeric was expressly limited to whether Biovation refused further releases after January 2023. Lock Dep. 126:1–9. And Biovation's reliance on Lock's answer that the Ascorbic Acid BPO was breached by "Nothing" ignores his immediate explanation that he understood the BPO to have expired under an industry standard one-year term. *Id.* 170:6–171:13.

Each challenged portion of Lock's declaration is also corroborated by contemporaneous record evidence, including A&Y's requests in September 2022 regarding the outstanding BPOs and the October 12, 2022 communication from Biovation instructing A&Y not to release additional Turmeric.[13] Resp. SUMF ¶ 62. Additionally, despite Biovation's contention, as discussed below, anticipatory repudiation was a theory pleaded in the Complaint. Compl. ¶¶ 99, 104, 110.

Therefore, Lock's "ability to point to evidence in the record that corroborates his later affidavit alleviates the concern that he merely filed an erroneous certification out of desperation to avoid summary judgment." *Baer v. Chase*, 392 F.3d 609, 626 (3d Cir. 2004). As a result, the Court will not disregard Lock's declaration as a sham affidavit.

[13] Biovation also objects to Lock's declaration to the extent that it constitutes as an improper use of settlement discussions under Federal Rule of Evidence 408. Reply at 10. The Court need not resolve Biovation's Rule 408 objection to decide the present Motion. Even assuming the October 12, 2022 email is not considered, the remaining record—including the parties' payment dispute, A&Y's September 2022 written requests concerning the outstanding BPOs, and the alleged failure to provide assurances—independently creates a factual dispute concerning insecurity, adequate assurances, and repudiation. *See* Resp. SUMF ¶ 62.

**B. Breach of Contract and UCC Claims (Counts I and II)**

The Court next addresses Counts I and II as they relate to the three BPOs that are the subject of this Motion: Turmeric, Quercetin, and Ascorbic Acid. Biovation principally argues that the BPOs had not expired when the Complaint was filed and that A&Y therefore cannot establish a breach. Mot. at 12–16. A&Y responds that the text of the BPOs, the parties' communications, industry practice, and testimony from Biovation's own witnesses permit a jury to find that the BPOs committed Biovation to purchase the stated quantities and that the applicable performance periods had expired before this action was commenced. *See* Opp'n at 27–33. A&Y alternatively relies on anticipatory repudiation and inadequate assurances, addressed in Section III.C. For the reasons set forth below, the record contains genuine disputes on those issues.

*1. Genuine disputes exist concerning the meaning of the BPOs generally*

Central to Counts I and II is the parties' dispute over whether each BPO obligated Biovation to purchase the full stated quantity or merely gave it an option to request materials later. Under New Jersey's UCC, the meaning of an agreement may be informed by course of performance, course of dealing, and usage of trade. N.J. Stat. Ann. §§ 12A:1-303, 12A:2-202; *Vision Indus. Grp. v. ACU Plasmold, Inc.*, No. 18-6296, 2026 WL 923095, at *10 n.13 (D.N.J. Apr. 6, 2026).

Here, the parties offer competing evidence concerning the commercial meaning of the BPOs. Cogswell—Biovation's procurement specialist—testified that, when he issued BPOs for Biovation, he understood Biovation to be committing to purchase and pay for the full stated quantity and that he believed other purchasing personnel, including his supervisor, Ford, shared that understanding. Cogswell Dep. 16:9–17:17. Bath—Biovation's President—by contrast, testified that Biovation viewed BPOs as "fairly open" and that it "may or may not draw" from the stated quantities. Bath Dep. 74:3–76:5. A&Y's expert likewise disputes Biovation's

characterization of the quantities as merely forecasted reserves. Resp. SUMF ¶¶ 13–18; Oberstaedt Decl., Ex. 28 ¶¶ 15–23.

This competing evidence creates a genuine dispute concerning the parties' commercial understanding. A jury must determine whether the quantities were binding purchase commitments or nonbinding forecasts.

Biovation separately argues that the three BPOs at issue had not expired when the Complaint was filed and that A&Y therefore cannot establish a present breach. Mot. at 12–14. A&Y disputes the operative commencement date of the Turmeric BPO and the duration of the Quercetin and Ascorbic Acid BPOs. *See* Opp'n. The Court addresses each point in turn.

*2. Turmeric BPO (P185532)*

Biovation asserts that the operative Turmeric BPO was issued on May 24, 2021, contained a two-year term, and therefore expired on May 24, 2023—two months after A&Y filed the Complaint on March 20, 2023; Mot. at 5; *see* Dkt. As a result, Biovation argues that A&Y cannot establish breach, an essential element to a contract claim, and therefore it is entitled to summary judgment. Mot. at 12–14. Because Biovation points to the Turmeric BPO dated May 24, 2021, A&Y must "point to some evidence in the record that creates a genuine dispute of material fact." *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing Fed. R. Civ. P. 56(e)) (citation modified).

In response, A&Y points to an original March 8, 2021 Turmeric BPO in the record and evidence that later revisions—including the May 24, 2021—version merely amended delivery details. Opp'n at 28–29; Oberstaedt Decl. Ex. 14. A&Y specifically points to an email from Cogswell to Lock dated March 8, 2021 with the subject line "NEW BLANKET PO 185532." Oberstaedt Decl. Ex. 14. The email states "Here is the purchase order for the Turmeric." *Id.* Attached to that email is the Turmeric PO, P185532, dated March 8, 2021. *Id.*; *see also* Oberstaedt

Decl. Ex. 15 (March 17, 2021 email from Cogswell to Lock saying "[h]ere is the revision to the Turmeric PO that we discussed."); Oberstaedt Decl. Ex. 16 (May 24, 2021 email from Cogswell to Lock saying "[h]ere is the revision," attaching the Turmeric BPO that Defendant argues is operative dated May 24, 2021). On each Turmeric BPO, the "Date Scheduled" is listed as March 8, 2021. *See* Oberstaedt Decl. Ex. 14–16.

In further support of A&Y's argument that the Turmeric BPO was first executed on March 8, 2021, Lock testified that he understood the Turmeric BPO to run from the date of the original purchase order, March 8, 2021. Opp'n at 29 (citing Lock Dep. at 174:15–24).

Viewing the evidence in the light most favorable to A&Y, a reasonable jury could conclude that the two-year term began on March 8, 2021 and expired before this action was filed. Alternatively, a jury could find that the Turmeric BPO began to run on May 24, 2021.[14] Because the record supports both readings, summary judgment is inappropriate. *Gramling v. Grit Pub. Co.*, 767 F. Supp. 97, 101 (M.D. Pa. 1991) (holding that because "there is some evidence of record supporting the respective positions of both sides, summary judgment is not appropriate").

*3. Quercetin BPO (P185849)*

The parties do not dispute that the Quercetin BPO was issued on May 6, 2021 and does not state an expiration date. Mot. at 5; Opp'n at 19–20.

A&Y argues, however, that the parties understood the BPO to have a finite term. Lock testified that he and Cogswell agreed in April or May 2021 that the BPO would run for one year.

[14] The Court rejects Biovation's argument that A&Y is bound to the May 24, 2021 date because the Complaint attached that version of the Turmeric BPO and alleged a May 24, 2023 performance deadline. Reply at 7–8. The March 8, March 17, and May 24 documents include the same purchase order number, and the later emails describe the documents as revisions. Oberstaedt Decl., Exs. 14–16. The record therefore creates a factual dispute concerning when the two-year period began. Regardless of whether the Turmeric BPO had expired when the Complaint was filed, A&Y also advances the alternative anticipatory repudiation theory addressed in Section III.C.

Lock Dep. at 107:1–108:13. Biovation rejects this contention and argues that A&Y "has failed to provide any valid, credible evidence to establish the alleged one year term for this BPO." Mot. at 13. More specifically, Biovation argues that A&Y's "only support is self-serving testimony that is contradicted by the actual document that was issued after the alleged verbal agreement and was not corroborated by the only other person who allegedly had the conversation." *Id.*

While Biovation is correct that a "self-serving deposition testimony is insufficient to raise a genuine issue of material fact," *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011), in the cases Biovation cites, "[*n*]*o* record evidence" supported the self-serving deposition testimony. *Id.* (emphasis added). That is not the case here: Lock's testimony is not the only evidence concerning the duration of the Quercetin BPO.

A&Y points to an internal Biovation email from Ford to Bath dated May 17, 2021, saying "Currently the quercetin has been very challenging . . . We were able to source it from A&Y and have a 2-week lead time and have place a blanket order for 2000kg over the next 6 quarters." Oberstaedt Decl., Ex. 24. A&Y also cites the deposition testimony of a Biovation employee, Cogswell, in which he testified that the industry standard expiration when a BPO is silent is one year. Opp'n at 20 (citing Cogswell Dep. at 15:10–23, 21:1–10). Lastly, A&Y relies on its expert, who confirmed A&Y's understanding of the expiration date of the Quercetin BPO as either one year or six quarters. Opp'n at 20 (citing Oberstaedt Decl., Ex. 28 ¶¶ 19, 39–40).

The record evidence taken together could lead a reasonable jury to conclude that the Quercetin BPO had a finite performance period that expired before A&Y filed this action, whether because the parties agreed to a one-year term or because the order was understood to cover six quarters, and need not rely on Lock's testimony to reach that conclusion.

Biovation's reliance on the absence of an express expiration date also does not resolve the issue as a matter of law. New Jersey's UCC supplies a "reasonable time" for performance when the parties have not otherwise agreed on the time for contractual action. N.J. Stat. Ann. § 12A:2-309(1). The competing evidence concerning a one-year agreement, the six-quarter internal description, and industry practice therefore creates a genuine dispute over the applicable time for performance. As a result, summary judgment on the Quercetin BPO is inappropriate.

*4. Ascorbic Acid (P187156)*

Biovation also seeks summary judgment on A&Y's claims arising from the Ascorbic Acid BPO. Similar to the Quercetin BPO, the parties do not dispute that the Ascorbic Acid BPO was issued on February 23, 2022 and also did not have an express expiration date. Mot. at 6–7; *see* Opp'n at 22. But A&Y disputes Biovation's contention that the Ascorbic Acid BPO remained open when A&Y filed the Complaint in March 2023. A&Y instead argues that, under industry practice, an undated BPO like this one was subject to a one-year term. Resp. SUMF ¶¶ 37, 40.

As noted above, the absence of a written expiration date does not establish that Defendant had an unlimited period in which to perform. New Jersey's UCC provides that when the parties have not agreed on the time for shipment, delivery, or another contractual act, performance must occur within a "reasonable time." N.J. Stat. Ann. § 12A:2-309(1); *see also Neptune Research v. Teknics Indus.*, 235 N.J. Super. 522, 531 (App. Div. 1989) (citing *id.*). Usage of trade may also "supplement or qualify" the parties' written terms. *Corestar Int'l PTE. Ltd. v. LPB Commc'ms, Inc.*, 513 F. Supp. 2d 107, 119 (D.N.J. 2007) (citation omitted).

The record contains evidence from which a jury could conclude that a reasonable period for performance had expired before this suit was filed. Cogswell—a Biovation employee—testified that when a blanket purchase order did not specify a duration, the industry standard was

one year. Cogswell Dep. at 21:1-9. As explained in relation to the Quercetin BPO, A&Y's expert likewise explained that the industry practice when considering an undated BPO was one year. Oberstaedt Decl., Ex. 28 ¶¶ 19, 39–40; Resp. SUMF ¶¶ 37, 40. A&Y also cites Cogswell's testimony that Defendant understood BPOs to commit it to purchase the full quantity stated, rather than merely creating a nonbinding "reserve." Resp. SUMF ¶ 39. And it is undisputed that Biovation never took delivery of or paid for any of the 1,025 kilograms ordered under the Ascorbic Acid BPO. Opp'n at 22 (citing Bath Dep. at 223:25-224:13; 226:12-227:1); Compl. ¶¶ 80–92. At minimum, that evidence creates a dispute over what constituted a reasonable time for performance.

Biovation's reliance on Lock's deposition testimony does not eliminate that dispute. When Lock was asked what Biovation had done to breach the Ascorbic Acid BPO, he initially answered "Nothing." SUMF ¶ 42. However, he immediately explained that he understood an undated blanket order to run for one year under industry custom and that, because the Ascorbic Acid BPO was issued on February 23, 2022, the period had expired before the Complaint was filed. Lock Dep. 170:6–171:21. He then reiterated that the one-year period was an industry, rather than personal, default. Lock Dep. 172:1–12. Viewed in the proper context, Lock's separate acknowledgments that the BPO contained no written expiration date establish only that the parties omitted an express temporal term—these statements do not resolve the UCC's reasonable time inquiry.

Accordingly, in assessing Biovation's Motion, the Court does not need to decide whether the BPO necessarily expired exactly one year after issuance. In fact, weighing the evidence and assessing the credibility of witnesses is a function of the jury. *Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1043 (3d Cir. 1988). At summary judgment, it is enough that the record evidence could permit a reasonable jury to conclude that the commercially reasonable period for

Defendant to take and pay for the Ascorbic Acid had expired before March 20, 2023. *Selvato v. SEPTA*, 658 F. App'x 52, 55 (3d Cir. 2016) ("[A]t summary judgment, it [is] the District Court's task to judge whether any reasonable jury could conclude from the record" in favor of the plaintiff). Biovation therefore has not established entitlement to summary judgment on A&Y's claims arising from the Ascorbic Acid BPO.

### C. Adequate Assurances and Repudiation

A&Y alternatively argues that, even if one or more of the BPOs had not expired when this action was filed, Biovation anticipatorily repudiated its remaining obligations or failed to provide A&Y with adequate assurances of performance. *See* Mot. at 15–16; Compl. ¶ 110. Biovation responds that (1) A&Y improperly introduced these theories in opposition, Reply at 9–10, and, (2) in any event, that no repudiation occurred, Mot. at 15–16.

#### *1. Anticipatory breach and adequate assurances are not newly asserted claims*

Biovation argues that A&Y improperly attempts to amend its Complaint through (1) its Opposition brief by relying on a March 8, 2021 Turmeric BPO not attached to the Complaint, Reply at 7–8, and (2) by invoking anticipatory repudiation when it was not adequately pled in the Complaint. Neither argument is persuasive.

*First*, A&Y's reliance on the March 8, 2021 Turmeric BPO does not add a new claim. A&Y merely provides record evidence to further support the claims in its Complaint. A&Y's Complaint alleged that Biovation breached the BPOs, and in support of that argument, A&Y included the operative BPOs as exhibits. *See* Compl. In response to Biovation's argument in its Motion that the BPOs had not yet expired, *see* Mot., A&Y pointed to record evidence not originally in the Complaint to explain that the BPOs included in the Complaint were amended versions of an original BPO that had expired, *see* Opp'n. The Complaint identifies the relevant Turmeric BPO as Purchase Order P185532 and attaches its May 24, 2021 version. The March 8, March 17, and

May 24 versions include the same purchase order number, and the later emails between the parties describe the March 17 and May 24 documents as revisions. Oberstaedt Decl., Exs. 14–16. *Compare* Compl. Ex. 1 *with* Oberstaedt Decl. Ex. 11–12; 14–16. A&Y may rely on that record evidence at summary judgment to dispute Biovation's contention that the two-year term necessarily began on May 24, 2021.

Summary judgment presents a plaintiff with "an opportunity promptly to supplement [its] response to the summary judgment motion with any pertinent evidence which may be uncovered." *Itzenson v. Hartford Life & Acc. Ins. Co.*, No. 99-4475, 2000 WL 1731321, at *2 (E.D. Pa. Nov. 21, 2000). In fact, a plaintiff "may not rely solely on his allegations in opposing summary judgment; he must provide affidavits or other evidentiary material." *Carson v. Main*, No. 14-7454, 2015 WL 14106466, at *1 (D.N.J. Sept. 30, 2015). Here, A&Y is doing just that.

*Second*, A&Y's anticipatory repudiation theory is not "brand new." Reply at 9. The Court notes at the outset that despite Biovation's contention that Plaintiff first introduced this theory in its opposition brief, Biovation itself moved for summary judgment on that theory before A&Y filed the Opposition. Mot. at 15 ("A&Y Conceded There Was No Anticipatory Repudiation or Promissory Estoppel").

More importantly, the Complaint repeatedly alleges that Biovation informed A&Y it would not perform and expressly pleads anticipatory breach. It alleges that, "[t]o the extent Biovation has not breached Purchase Orders 1, 2, 3, and/or 4, it has anticipatorily breached them in violation of the Uniform Commercial Code." Compl. ¶ 110; *see also* Compl. ¶¶ 99, 104. A&Y's response to Biovation's Rule 56.1 statement likewise identifies anticipatory breach as part of the Complaint's pleaded claims. Resp. SUMF ¶¶ 63, 65, 67.

Indeed, "[a] complaint 'need not plead law or match facts to every element of a legal theory,' because the purpose of allegations laid out in a complaint is to give the defendant fair notice of the plaintiff's claims and the grounds on which they rest." *Haines v. State Auto Prop. & Cas. Ins. Co.*, No. 08-5715, 2009 WL 1767534, at *4 n.2 (E.D. Pa. June 22, 2009) (first quoting *Weston v. Pennsylvania*, 251 F.3d 420, 429 (3d Cir. 2021); then citing Fed. R. Civ. P. 8(a)(2)).

As the Complaint appropriately pleaded facts to give Biovation notice of a claim of anticipatory repudiation or under the UCC's adequate assurances framework, the Court rejects Biovation's argument that A&Y improperly asserted these arguments in an effort to amend the Complaint.

*2. There is a genuine dispute regarding A&Y's anticipatory repudiation/adequate assurance theory*

Even if Biovation is correct that one or more of the BPOs had not expired when the Complaint was filed, summary judgment is still not warranted because there is additionally a genuine dispute regarding whether Biovation anticipatorily repudiated its remaining obligations under the BPOs and failed to provide adequate assurances of performance.

Biovation argues that no repudiation occurred because Lock admitted that Biovation never expressly stated that it would refuse to fulfill the Turmeric, Quercetin, or Ascorbic Acid BPOs. Mot. at 15–16. But under New Jersey law, anticipatory repudiation is not limited to an express refusal to perform. *Spring Creek Holding Co. v. Shinnihon U.S.A. Co.*, 399 N.J. Super. 158, 179 (App. Div. 2008). Instead, "anticipatory repudiation includes cases in which reasonable grounds support the obligee's *belief* that the obligor will breach the contract." *Id.* (emphasis in original) (quoting *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337 (Fed. Cir. 2000) (citing Restatement (Second) of Contracts § 251(1981)). When a party has reasonable grounds to believe that its counterparty will not perform, the party may demand adequate assurances. N.J. Stat. Ann. § 12A:2-609. "A

party need not wait for an actual material breach to demand assurances; it need only show that it reasonably believed that such an event might" occur. *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 330 (D.N.J. 2002).

Specifically under the UCC, between merchants, both the reasonableness of the insecurity and the adequacy of the assurance are determined according to commercial standards. N.J. Stat. Ann. § 12A:2-609(1)–(2). If a justified demand is made and adequate assurance is not provided within a reasonable time, not exceeding thirty days, that failure constitutes a repudiation. *Id.* § 12A:2-609(4). Whether the grounds for insecurity were reasonable and whether any response is adequate are "ordinarily questions of fact for the jury." *Spring Creek*, 399 N.J. Super. at 179–80.

Viewing the record in A&Y's favor, the record supports a finding that A&Y had reasonable grounds for insecurity and sought assurances from Biovation. By 2022, the record includes evidence that Biovation had repeatedly failed to make expected callouts despite assurances that it would try to order additional product, and the parties had a payment dispute concerning Turmeric after Biovation sought to apply funds prepaid for Quercetin as a credit against Turmeric deliveries. Resp. SUMF ¶ 53.

In September 2022, A&Y retained counsel, and on September 6, 2022, counsel wrote to Biovation seeking information concerning each purchase order and demanding payment of the outstanding Turmeric invoice within seven days. When Biovation did not respond, counsel sent a second letter on September 14, 2022 extending the deadline. *Id.* ¶ 62. Moreover, those communications did not need to have expressly cited UCC Section 2-609; such an omission does not preclude a factfinder from treating those communications as demands for adequate assurance. *See Koch Materials*, 205 F. Supp. 2d at 332 (finding letter from attorney to constitute demand for

assurance and noting that "courts have routinely accepted as sufficient under § 609 requests for assurances of a far less formal nature").

The subsequent record further supports a factual dispute as to whether adequate assurances were provided. On October 12, 2022, Ford instructed A&Y that "there has been no deal that has been agreed upon," directed A&Y not to release additional Turmeric "at this time," and stated that he would have no further communications until counsel "settled the issues."[15] Resp. SUMF ¶ 62. Lock further declared that, after A&Y sought assurances, Biovation never assured A&Y that it would take and pay for the remaining Quercetin, Echinacea, and Elderberry, and never assured A&Y that it would pay in full for future Turmeric deliveries without applying the disputed Quercetin credit. Lock Decl. ¶ 13.

Taken together, this evidence would permit a reasonable jury to find that A&Y had reasonable grounds for insecurity, that the September communications constituted demands for adequate assurances, and that Biovation did not provide assurances adequate under the circumstances. As explained, weighing this testimony is ordinarily a question for a jury. *Spring Creek*, 399 N.J. Super. at 179–80. Summary judgment is therefore unwarranted on A&Y's anticipatory repudiation and adequate assurances theories. The Court need not determine whether the record independently establishes an Ascorbic Acid-specific assurance theory because the Ascorbic Acid claims survive under the reasonable time analysis above.

[15] As noted above, *supra* note 13, the Court need not rely on the October 12 email to resolve the Motion. Even without it, the earlier course of conduct, the payment dispute, A&Y's September written requests, and Biovation's alleged failure to provide assurances create a genuine dispute of material fact.

**D. Implied Covenant of Good Faith and Fair Dealing (Count III)**

Biovation also seeks summary judgment on A&Y's claim for breach of the implied covenant of good faith and fair dealing, arguing that there is no evidence that it acted in bad faith, that Plaintiff acted in bad faith, and that the claim is duplicative of A&Y's breach of contract claim. Mot. at 16–17; Reply at 10–11. None of these arguments warrants summary judgment.

In New Jersey, every contract contains an implied covenant of good faith and fair dealing. *Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004) (collecting cases and noting "the New Jersey courts' adherence to this view"). The covenant "calls for parties to a contract to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224–25 (2005) (citation omitted).

When one party has the right to contractual discretion, such a party breaches the implied covenant "if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001). Such an action "would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial." *Id.* Evidence of bad faith may be established through circumstantial evidence. *Id.* at 253–54.

Courts in this Circuit have noted that the question of whether a party acted in good faith is generally not appropriate for summary judgment. *See Spiegel v. Goldin Auctions, LLC*, No. 23-1202, 2026 WL 1506679, at *7 (D.N.J. May 29, 2026) ("Whether Defendants exercised their contractual discretion in good faith presents fact-intensive issues generally unsuitable for summary adjudication on this record."); *OTOS Tech Co. v. OGK Am., Inc.*, No. 03-1979, 2005 WL 8175072,

at *5 (D.N.J. June 2, 2005), *aff'd*, 295 F. App'x 514 (3d Cir. 2008) (denying summary judgment and explaining that "[w]hether the contract was terminated in bad faith is a genuine issue of fact that should be decided by the factfinder.").

Viewing the record in A&Y's favor, summary judgment is not appropriate on A&Y's implied covenant claim. Cogswell testified that Biovation personnel understood that the BPOs committed Biovation to the stated quantities and that A&Y expected Biovation to purchase and pay for those quantities. Resp. SUMF ¶¶ 15–16 (quoting Cogswell Dep. 16:9–17:17). The record also reflects that, after downstream demand problems arose through Biovation's customers, Cogswell and Ford discussed their effect on the outstanding A&Y BPOs. *Id.* ¶ 47. Cogswell testified that Biovation had been directed to cease certain business with A&Y because some of Biovation's customers had existing vendor relationships that were being given priority, and that he learned Biovation was not going to honor some of the agreements reached with A&Y. Cogswell Dep. 74:8–77:8. He further testified that he told Ford it was "pretty apparent" that Biovation remained responsible for the quantities it had ordered from A&Y. *Id.* at 82:5–17.

There is similar evidence concerning the BPOs at issue in this Motion. Regarding Turmeric, for example, Cogswell testified that Biovation had already entered into agreements with A&Y when one of Biovation's customers, Healthy Directions, required Biovation to continue using another supplier as its primary source, and that Bath responded that Biovation "couldn't go forward with" the A&Y agreements. Opp'n at 11–12 (quoting Cogswell Dep. 56:16–57:6). Regarding Quercetin, when asked why Biovation executed a BPO when A&Y was approved only as a secondary supplier, Cogswell suggested that Biovation agreed to the stated quantity to obtain the "prices we wanted." *Id.* at 20–21 (quoting Cogswell Dep. 65:22–66:13). A reasonable jury

could consider these circumstances in determining whether Biovation exercised any asserted discretion with an improper motive.

The implied covenant claim also is not necessarily duplicative of A&Y's breach of contract theory as Biovation suggests. Reply at 11. An implied covenant claim cannot proceed "unless the underlying conduct is distinct from that alleged in a corresponding breach of contract claim." *MZL Capital Holdings, Inc. v. TD Bank, N.A.*, 734 F. App'x 101, 106 (3d Cir. 2018). Here, however, A&Y expressly pleads the claim in the alternative, alleging that, "[t]o the extent" Biovation's conduct did not violate an express provision of the BPOs, that conduct nevertheless "denied A&Y the benefits and expectations" of the agreements. Compl. ¶¶ 113–16.[16] More importantly, Biovation itself maintains that the BPOs gave it broad discretion whether and when to make additional callouts. Bath testified that Biovation viewed the BPOs as "fairly open" and that it "may or may not draw" from the quantities stated. Opp'n at 35 (quoting Bath Dep. at 74:3–76:5). Put simply, A&Y's implied covenant claim asks a different question from its express breach of contract claim: whether Biovation exercised that asserted discretion in bad faith so as to deprive A&Y of the benefit of the bargain. New Jersey law permits such a theory "even though that

[16] A&Y also brings promissory estoppel/detrimental reliance in the alternative if the BPOs are not found to constitute enforceable contracts. Compl. ¶¶ 117–23. Biovation argues that the claim cannot survive because it never expressly stated that it would not fulfill the BPOs. Mot. at 15–16. The Court disagrees. Promissory estoppel requires "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 161 (3d Cir. 2018) (quoting *E. Orange Bd. of Educ. v. N.J. Sch. Constr. Corp.*, 405 N.J. Super. 132, 148 (App. Div. 2009)). A&Y's promissory estoppel theory does not depend on a later express refusal to perform. The relevant alleged promise is Biovation's commitment reflected in the BPOs and surrounding communications, together with evidence that Biovation understood A&Y would procure and warehouse materials in reliance on those orders. *See* Opp'n at 2; Cogswell Dep. 16:9–17:17, 29:20–31:2, 33:5–13, 78:13–79:15. Because the enforceability and scope of the BPOs remain disputed, summary judgment on A&Y's alternative detrimental reliance theory is likewise unwarranted.

[challenged conduct] does not violate a pertinent express term." *Wilson*, 168 N.J. at 244 (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997)).

Finally, Biovation's argument that A&Y itself acted dishonestly does not establish that Biovation is entitled to summary judgment. Biovation argues that A&Y acted in bad faith by misrepresenting A&Y's financial condition "in an attempt to compel Biovation to do something it was not contractually obligated to do," and in support of this argument, points to three expensive vehicles owned by the company. *See* Mot. at 9, 17. A&Y disputes how Biovation characterizes A&Y's statements concerning its financial position. Opp'n at 35–36 & n.7; Resp. SUMF ¶¶ 59–61. While A&Y's conduct may be relevant to the parties' credibility, this argument is independent from the disputed material facts explained above regarding whether Biovation acted in bad faith, the key issue on this Motion.

Accordingly, summary judgment on A&Y's implied covenant claim is inappropriate because genuine disputes of material fact remain as to whether Biovation acted in bad faith in performing the BPOs and, in particular, in exercising whatever discretion the BPOs afforded it concerning future callouts.

* * *

In sum, genuine disputes of material fact remain as to Biovation's obligations under each of the three BPOs at issue, including the duration of those obligations, whether Biovation breached or anticipatorily repudiated them, and whether its conduct violated the implied covenant of good faith and fair dealing. The same factual disputes preclude summary judgment on A&Y's alternative promissory estoppel theory, which depends on the parties' competing interpretations of the BPOs and A&Y's alleged reliance on Biovation's commitments. Resolving these issues would require the Court to weigh conflicting testimony and draw inferences concerning the parties'

intent, course of dealing, and conduct—functions reserved for the factfinder. *See Spring Creek*, 399 N.J. Super. at 179–80.

Accordingly, Biovation's motion for summary judgment will be **DENIED** on Counts I through IV as they relate to the Turmeric, Quercetin, and Ascorbic Acid BPOs.

### E. Lost Profits Damages

Biovation separately seeks summary judgment on A&Y's lost profits damages theory, arguing that A&Y's methodology to support the theory is incomplete because it only relies on the direct cost of procuring the products in each BPO, which is "not a reasonably accurate and fair basis to compute the alleged lost profits" and would require a jury to speculate. Mot. at 18–20.

Under New Jersey law, a damages theory for lost profits must be established by a "reasonable degree of certainty," and any "[a]nticipated profits that are remote, uncertain or speculative" are not recoverable. *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 206 N.J. 596, 609 (2011) (citations omitted). A plaintiff does not, however, need to "fix its damages with precision" to recover lost profits damages. *V.A.L. Floors, Inc. v. Westminster Communities, Inc.*, 355 N.J. Super. 416, 424 (App. Div. 2002) (quoting *Inter Medical Supplies v. EBI Medical Sys.*, 181 F.3d 446, 463 (3d Cir. 1999)). Specifically, at summary judgment, a plaintiff is not "required to prove the dollar amount" to support a lost profits damages theory. *Id.* at 425–26; *see also Lithuanian Com. Corp. v. Sara Lee Hosiery*, 23 F. Supp. 2d 509, 516 (D.N.J. 1998) (after a trial, noting that the plaintiff was "not required to provide the jury with an expert on damages, or with mathematically precise evidence regarding" lost profits damages because "any projection of lost profits is necessarily an estimate").

Instead, net profit is the difference between lost gross income and the costs and expenses that would have been incurred to produce that income. *V.A.L. Floors*, 355 N.J. Super. at 423–24.

But "where the plaintiff's overhead or fixed expenses are not affected by the defendant's breach," such costs are not necessarily to be deducted from the plaintiff's lost profits. *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1412 (3d Cir. 1985).

The present record does not warrant summary judgment on A&Y's lost profits damages theory. A&Y's interrogatory responses identify the quantities on which it seeks lost profits and explain its methodology as the contract price per kilogram less the costs A&Y would have incurred to supply the product. Opp'n at 37; A&Y Interrogatory Responses at 3–6. The responses further identify product specific costs. For example, A&Y calculates the remaining Quercetin using a landed cost of $96.98 per kilogram, including raw material, freight, customs, and transportation expenses, A&Y Interrogatory Responses at 5; the Ascorbic Acid calculation uses a $4-per-kilogram landed cost, *id.* at 6; and the Turmeric calculation uses a $65-per-kilogram landed cost, *id.* at 5. A&Y also asserts that it produced "financial statements, payroll records, profit and loss statements, tax returns and schedules, vendor contracts and invoices, communications with vendors, storage records and related expenses." Opp'n at 37. Thus, this is not a case in which the record contains no basis from which lost profits could be estimated.

Neither does the absence of a damages expert itself preclude A&Y from recovering lost profits damages. A business owner with sufficient personal knowledge of the company's operations may, in appropriate circumstances, offer lay testimony concerning lost profits. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175–76 (3d Cir. 1993) (holding lay witness with personal knowledge of the business can be sufficient to testify as to calculation of lost profits damages). Lock is A&Y's managing member and declares that he personally handles most of its day-to-day operations and is familiar with its finances. Lock Decl. ¶¶ 1–2. The Court need not

resolve at summary judgment the admissibility of any particular testimony under Federal Rules of Evidence 701 or 702, or the admissibility of the supporting documents.

A&Y ultimately must prove net-, rather than gross-, lost profits. If additional variable expenses would have been incurred to complete the sales, those expenses must be accounted for, and Biovation remains free to challenge A&Y's calculations on that basis. But Biovation's contention that additional costs may have existed does not establish, on the present record, that no reasonable jury could calculate lost profits without speculation. A&Y has identified revenues, product specific costs, and underlying financial records that could assist a jury in that calculation. Any remaining dispute over additional expenses that should be deducted concerns the amount and evidentiary support for damages, not whether lost profits are categorically unavailable to A&Y.

Accordingly, the Court will **DENY** Biovation's Motion to the extent it seeks to preclude A&Y from recovering lost profit damages. This ruling does not foreclose appropriate evidentiary objections at trial or relieve A&Y of its burden to establish its lost profits with reasonable certainty.

## IV. CONCLUSION AND ORDER

For the reasons stated above,

**IT IS**, on this **9th** day of September, 2026,

**ORDERED** that Biovation's motion for partial summary judgment, pursuant to Federal Rule of Procedure 56(a) against A&Y, D.E. 59, is **DENIED**; it is further

**ORDERED** that the parties are referred to mediation pursuant to L. Civ. Rule 301.1, and shall contact the chambers of Hon. André M. Espinosa, U.S.M.J., within **30 days** of this Order, for further instructions.

Evelyn Padin, U.S.D.J.